# Exhibit A



March 13, 2019

**LVH Global**
**Attn: Amir Benesh, Founder & CEO**
**505 Fifth Avenue**
**15th Floor**
**New York, NY 10017**

Dear **Amir:**

We are excited to work with you and **LVH GLOBAL.** So that we may officially initiate our work on your behalf, please review the following pages and sign your name at the bottom of this letter to indicate your agreement with the terms of our relationship.

Best,

**David Warschawski**

**1.  The Parties**
Warschawski Public Relations, Inc., t/a Warschawski, with a principal place of business at 1501 Sulgrave Avenue, Suite 350, Baltimore, MD 21209 ("Agency") requires that we have a signed agreement in place to perform and bill marketing communications services on behalf of **LVH Global** (hereinafter the "Agreement") with a principal place of business **505 Fifth Avenue, 15th Floor, New York, NY 10017** ("Client") (Client and Agency collectively referred to herein as "the Parties").

**2.  The Term**
Beginning **March 1, 2019**  and subject to the terms herein, this Agreement shall last for a period of twelve (12) months (hereinafter the "Term"), except as set forth in Section 6 below.

**3.  Basic Services**
Agency will serve as Client's marketing communications agency of record for the United States ("Basic Services").  As such, Agency will provide services that may include, but are not limited to:  research, concept ideation, consulting, strategic plan creation, conceptual design, graphic design, illustration, print design, web design, digital design, email design, brand refinement, brand creation, public relations, marketing, advertising, event planning, event promotion, content writing, production and manufacturing work (hereinafter collectively referred to as the "Works").  The Parties have developed a specific scope of work attached hereto as Exhibit A. The Parties agree that Exhibit A may be amended from time to time, as mutually agreed to by the parties.

**4.  Compensation**
A.  Client shall compensate Agency for Basic Services ("Agency Compensation"') as set forth in **Exhibit B**.

B. In addition to the compensation outlined in **Exhibit B,** to compensate Agency for Basic Services, David Warschawski and Sam Ruchlewicz shall have the option to purchase up to an additional $100,000 of LVH Capital Stock at the current Valuation of $15 Million. This option will expire December 31, 2019.

B. Agency Compensation remunerates Agency for up to **80** hours of Basic Services per calendar month for the Term of this Agreement. Hours expended in any calendar month on Client's behalf in excess of **80** hours shall be billed at $225.00 for each such hour ("Overage Hours"); provided, however, that Agency will surpass the **80** hours in each calendar month only with pre-approval from Client.

**5.  Account Management Fee**
All out-of-pocket expenses and third-party charges shall be billed separately, together with an Account Management Fee equal to 17.65% of the expenses or third-party charges.  The Account Management Fee compensates Agency for all work and responsibility assumed by Agency in dealing with such expenses and charges and covers all responsibilities assumed by Agency for project management, including project coordination and project oversight in working with third party vendors, handling billing issues, as well as monitoring costs for Client and providing Client with pass through billing services.  The Account Management Fee shall be due on

DocuSign Envelope ID: 1AF09A4D-C7FB-4793-8ABA-CD1FD5F30428

the same date as the Monthly Payment.  Agency will not incur one-time expenses or third-party charges of this type that exceed $500.00 without prior approval from Client.

**6.  Termination**
A.  Agreement shall continue for the entirety of the Term, unless terminated by Client within the first 90 days of the Agreement (Termination Period) on 30 days' written notice. Client agrees that Agency requires 30 days' notice to ensure adequate planning, staffing and timing of its services and Client agrees that 30 days' notice of cancellation or modification to Agreement is necessary to ensure the effective rendering of its services and to prevent damage to Agency which would result without sufficient notice.

B.  In the event of non-payment by Client of any fees or sums due hereunder, should Client fail to cure the non-payment breach within 5 business days after written notice of breach by Agency, Agency is entitled to terminate this Agreement and to stop all work without further notice.  In the event Agency terminates Agreement for failure to pay, Client agrees to pay Agency $45,000, which Client acknowledges is not an election of remedy and fairly represents losses to Agency in the event of Client's uncured material breach giving rise to termination under this section.

C.  Upon termination of this Agreement for any reason by either party, Client shall pay all unpaid invoices, fees, expenses and costs due to Agency through the termination date, whether or not yet invoiced, as well as all amounts due to third Parties incurred prior to the termination date, except those paid directly to such third Parties by Client.  Client agrees to pay Agency's reasonable attorneys' or collection agency fees arising from such default.

**7.  Limitation of Liability**
A.  Agency will use reasonable, professional efforts consistent with the ethical practice of its services and will exercise its best judgment in the preparation of materials. Client covenants and agrees that it shall obtain all necessary authorizations to use copyrighted or trademarked materials, art work, or any other property or rights belonging to third Parties that Client supplies to Agency for use and in the performance of this Agreement.  Client agrees to indemnify, defend and hold harmless Agency from any and all claims, demands, damages, costs, including attorneys' fees, arising from or connected with (i) Client's use of the Works, or (ii) any breach of any representation, warranty, or covenant made by Client hereunder.  Client understands and agrees that it is Client's sole and exclusive responsibility to assure that all Works are cleared for use.  Client understands that Agency makes no representations or warranties that any or all of the Works is/are cleared for use by Client, or that such items are available for use or registration.

B.  Whenever possible, Client will review all materials prepared by Agency to confirm that any representations with respect to Client's products, services or conduct are true and, if appropriate, supportable by competent and reliable tests or other objective data, as well as to confirm the accuracy and legality of the descriptions and depictions of Client's products or services.  Client agrees to indemnify, defend and hold harmless Agency with respect to any claims of unfair competition which may involve, for example (i) trademark, trade name, or service mark infringement or (ii) false, misleading, deceptive or fraudulent advertising, including all claims arising out of materials or content provided to Agency by Client or approved by Client prior to use.  Client agrees to indemnify, defend and hold harmless Agency with respect to any claims or actions regarding Client's products or services, and Client shall carry liability insurance on any product or service in connection with which Agency provides services.

**8.  Rights in Works**
All rights in the Works, whether or not used by Client, shall be the sole and exclusive property of Client, including all intellectual property rights therein and the right to make reproductions and derivative works thereof, provided Client has timely paid in full the Agency Fee and all other fees and expenses due hereunder.  If Client does not remit timely and full payment of the Agency Fee or any other fee or expense, the Works in their entirety, including without limitation, all intellectual property and ownership rights therein, shall remain the exclusive property of Agency and shall not pass to Client.  Notwithstanding the foregoing, Agency retains the right and is entitled to use copies of the Works for marketing and industry competition purposes to demonstrate the nature and scope of Agency's services and clientele.

Client shall retain ownership of and rights to all materials supplied by Client to Agency ("Client Materials").  Client represents and warrants that Client Materials shall not infringe any copyright, trademark, trade secret or other third-party proprietary right.  Client grants Agency a non-exclusive right and license to use and modify Client Materials as Agency deems necessary in order to perform its obligations under this Agreement.

**9. Restrictive Covenant**

For the duration of the Agreement and for a period of 24 months following its termination for any reason, the Parties, their affiliates, employees, officers, directors, agents, successors and assigns, consent and agree that they shall not hire or solicit for employment any employee of the other who engaged in any business-related activity in connection with this Agreement. The Parties acknowledge that breach of this Restrictive Covenant will cause immediate and irreparable harm to the non-breaching party, entitling the non-breaching party to an injunction without the posting of a bond. Pursuit or award of an injunction shall not impair or limit either party's right to other remedies or damages in law or equity.

**10. In the Event of a Dispute**

This Agreement shall be governed by and construed in accordance with the laws of the State of Maryland. The Parties consent to submit, and waive all contest, to the personal jurisdiction of the courts of Maryland in the event of a dispute and agree that any litigation arising from or relating to this Agreement shall be brought in a Maryland state or federal court. In the event of litigation, the prevailing party shall be entitled to recover its reasonable attorneys' fees, expert witness fees, court costs, and expenses incurred in the action.

**11.    Survival of Rights and Obligations**

All rights, obligations and remedies which a party may accrue hereunder prior to termination shall survive termination. This Agreement shall be binding upon and shall inure to the benefit of the Parties, their successors and assigns.

**12. Severability**

If any term of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, this Agreement, including all remaining terms, will remain in full force and effect as if such invalid or unenforceable term had never been included.

**13. Waiver and Assignment**

Failure to insist upon strict performance of any term of this Agreement shall not act as a waiver of any party's rights or entitlements hereunder. Neither this Agreement, nor any of the rights, interests, duties or obligations hereunder, may be assigned or delegated by either party absent prior written consent of the other party.

**14.    Section Headings; Counterparts.**

The section and paragraph headings contained in this Agreement are for reference purpose only and shall not affect in any way the meaning or interpretation of this Agreement.

**15. Entire Agreement**

This Agreement, inclusive of all exhibits, supersedes all previous representations, understanding and agreements between the Parties regarding the subject matter covered herein and constitutes the entire understanding and agreement between the Parties regarding the subject matter covered herein. There are no other courses of dealing, understanding, agreements, representations or warranties, written or oral, except as set forth herein. This Agreement may not be amended or modified except by a writing signed and dated by both Parties.

**ACCEPTED AND AGREED: LVH Global**

By: _Amir Benish_____     Date: ___3/13/2019_____

DocuSigned by:
8D24EFA2F1F9483...
**Amir Benish**

Title: ___Founder &CEO_____

Exhibit A:

## **LVH GLOBAL Marketing Scope of Work**

As used herein, "month" shall refer to a 30-day period, commencing on the effective date of this contract.

**Month #1: Branding Work**
- Create Strategic Positioning Document for LVH
- Update Visual Identity for LVH, including:
  - Logo
  - Imagery
  - Collateral
  - Website (front-end styles only)
  - Landing Pages (front-end styles only)
  - Newsletter Template
  - Review Packet
- Conduct Audit of Current Digital Marketing Campaigns/Efforts
  - Google Ads Campaigns
  - Facebook & Instagram Campaigns
  - YouTube Campaigns
  - Twitter/LinkedIn Campaigns
- Begin Monitoring SEO for LVH
  - Create preliminary list of keywords, pending review by LVH
  - Identify key competitors from SEO & SEM(PPC) Standpoint & Begin Tracking

**Month #2: Marketing Plan & Collateral**
- Create Social Media & Blog Content Calendar
  - Begin Posting to Social Media Upon Approval
- Create 2019 Marketing Plan for LVH Global
- Create Budget & Secure Approval for all Digital Campaigns
  - Upon Approval, Create Pacing Tracker to Manage Budget
  - Upon Approval, Begin Ad Design
- Review Findings from Audit & Secure Approval to Move Forward with Recommendations
  - Upon Approval, Provide LVH with Timelines for Implementation
- Design New E-Mail Templates for Specific Uses
  - New Location
  - Partners
  - Owners
  - Welcome
  - Packaged
  - Special Events
- Design Branded Items for LVH
  - Mug
  - T-Shirt/Polo Shirt
  - Pen
  - Others

**Month #3: Launch of New Campaigns & Collateral**
- Update & Launch All New Digital Campaigns
- Build Dashboard for Digital Campaign Reporting
- Create PR Strategy for LVH
  - Upon Approval, Begin Executing PR Strategy
- Create/Update Presentations for LVH
  - Overview
  - Partners
  - Homeowners

- o   Concierge
- Create Social Calendar For Month; Post
- Draft 1-2 Blog Posts; Post

**Ongoing/Ad Hoc:**
- Manage all Digital Campaigns
- Launch New Digital/Social Media Campaigns
- Provide Monthly Reporting on LVH Digital/Social Campaigns & SEO Initiatives
  - o   Reports will also provide updates on Competitors (as appropriate)
- Design Print Ads for Magazines
- Create & Post Social Calendar for Month
- Draft & Post 1-2 Blogs Per Month (as appropriate)
- Update Website & Property Descriptions (as appropriate)
- Draft Press Releases & Pitch Media to Secure Coverage (as appropriate)
- Create New Videos or Collateral Material for LVH
- Assist with other programming/events as appropriate
  - o   VIP Dinners
  - o   Parties/Launches
  - o   New Offerings or Locations

DocuSign Envelope ID: 1AF09A4D-C7FB-4793-8ABA-CD1FD5F30428

Exhibit B:

## Summary of Compensation

| Month | Warrant (shares) | Payment* | Equity | Total Comp**. |
|---|---|---|---|---|
| March, 2019 | 833 | $15,000 | $5,000 | $20,000 |
| April, 2019 | 833 | $10,000 | $5,000 | $15,000 |
| May, 2019 | 833 | $10,000 | $5,000 | $15,000 |
| June, 2019 | 833 | $10,000 | $5,000 | $15,000 |
| July, 2019 | 833 | $10,000 | $5,000 | $15,000 |
| August, 2019 | 833 | $10,000 | $5,000 | $15,000 |
| September, 2019 | 833 | $10,000 | $5,000 | $15,000 |
| October, 2019 | 833 | $10,000 | $5,000 | $15,000 |
| November, 2019 | 833 | $10,000 | $5,000 | $15,000 |
| December, 2019 | 833 | $10,000 | $5,000 | $15,000 |
| January, 2020 | 833 | $10,000 | $5,000 | $15,000 |
| February, 2020 | 837 | $10,000 | $5,000 | $15,000 |
| **Total** | **10,000***** | **$125,000** | **$60,000******* | **$185,000** |

*Referred throughout as "Monthly Payment" or "Monthly Agency Compensation Fee"
**" Total Comp." refers only to Payment + Equity
*** Warrant is incorporated herein as **Exhibit B.1**.
**** Equity investment is structured in two parts, referenced in Section 4: Compensation:
      SAFE in David Warschawski's name, in the amount of $15,000 effective date of execution (**Exhibit B.2**)
      SAFE in David Warschawski's name, in the amount of $45,000 effective date of execution (**Exhibit B.3**)

## Schedule of Compensation

LVH Global, Inc. (Client) shall compensate Agency as outlined in the summary above in the following manner:

- Sums outlined in the Payment column above to be made monthly by LVH Global, Inc. (Client) to Warschawski (Agency). Agency will invoice the Monthly Payment on the 15th day of each month, approximately 45 days prior to the start of the month in which Basic Services are to be rendered.  Client shall satisfy each Monthly Payment on or before the 15th day of the month prior to which Basic Services are to be rendered.  For example, the Monthly Payment for Basic Services performed in August is invoiced on June 15th and payment is due to be satisfied on or before July 15th.
- **Exhibit B.1,** LVH Global, Inc. Warrant, to be executed by Client upon execution of this Agreement.
- **Exhibit B.2,** LVH Global, Inc. Simple Agreement for Future Equity (SAFE), in the amount of $15,000 effective date of execution, to be executed by Client upon execution of this Agreement
- **Exhibit B.3,** LVH Global, Inc. Simple Agreement for Future Equity (SAFE), in the amount of $45,000 effective date of execution, to be executed by Client at the conclusion of the ninety (90) day termination period outlined in Section 6.

DocuSign Envelope ID: 1AF09A4D-C7FB-4793-8ABA-CD1FD5F30428

**Exhibit B.1**

**THIS WARRANT AND THE UNDERLYING SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT").  THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO SUCH SECURITIES UNDER THE ACT OR AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE CORPORATION THAT SUCH REGISTRATION IS NOT REQUIRED.**

**LVH GLOBAL, INC.**

**WARRANT**

Dated: [ 03-31 ], 2019

Void After [ 03-31 ], 2034

This certifies that, for value received, **David Warschawski** (the "**Holder**"), is entitled to subscribe for and purchase at the Exercise Price (defined below) from LVH Global, Inc., a Delaware corporation, with its mailing address at 505 Fifth Avenue, 15th Floor, New York, NY 10017 (the "**Corporation**"), the number of whole Exercise Shares (as defined below), upon the terms and subject to the adjustments as provided herein.

    **1.**    DEFINITIONS.  As used herein, the following terms shall have the following respective meanings:

    **(a)**    "**Exercise Period**" shall mean the time period commencing with [ 03-31 ], 2019 and ending on [ 03-31 ], 2034, unless sooner terminated as provided below.

    **(b)**    "**Exercise Price**" shall mean $2.00 per share.

    **(c)**    "**Exercise Shares**" shall mean 10,000 shares of Stock, *provided, however*, that the number of Exercise Units that may be exercised hereunder shall be subject to vesting over a 12-month period as follows: 833 Exercise Shares shall vest on the first day of each month starting with and following the Issuance Date (with 837 vesting in the final month) subject to the Holder remaining in the continuous service of the Company during such period, *provided, further*, that vesting with respect to all unvested Exercise Shares shall accelerate in full (such that all Exercise Shares shall become fully-exercisable) in the event of and immediately prior to any event of Early Termination under Section 5.2 hereof.

    **(d)**    "**Stock**" shall mean the Corporation's common Stock.

    **2.**    EXERCISE OF WARRANT.  The rights represented by this Warrant to purchase the Exercise Shares (this **"Warrant"**) may be exercised in whole or in part at any time during

1

the Exercise Period, by delivery of the following to the Corporation at its address set forth above (or at such other address as it may designate by notice in writing to the Holder):

**(a)** an executed Notice of Exercise in the form attached hereto as Exhibit A;

**(b)** payment of the Exercise Price either (i) in cash or by check, (ii) by cancellation of indebtedness, or (iii) pursuant to Section 2.1 below; and

**(c)** this Warrant.

Upon the exercise of the rights represented by this Warrant, a certificate or certificates for the Exercise Shares so purchased, registered in the name of the Holder, shall be issued and delivered to the Holder as soon as practicable after the rights represented by this Warrant shall have been so exercised.  If this Warrant is exercised in part, a new Warrant representing the remaining Exercise Shares and including the same terms as set forth herein shall be delivered to the Holder concurrent with delivery of the certificate or certificates for the Exercise Shares so purchased.

The person or entity in whose name any certificate or certificates for any Exercise Shares are to be issued upon exercise of this Warrant shall be deemed to have become the holder of record of such shares on the date on which this Warrant was surrendered and payment of the Exercise Price was made, irrespective of the date of delivery of such certificate or certificates, except that, if the date of such surrender and payment is a date when the stock transfer books of the Corporation are closed, the Holder shall be deemed to have become the holder of such shares at the close of business on the next succeeding date on which the stock transfer books are open.

**2.1     Net Exercise**. Notwithstanding any provisions herein to the contrary, if the fair market value of one share of the Exercise Shares is greater than the Exercise Price (at the date of calculation as set forth below), in lieu of exercising this Warrant by payment of cash, the Holder may elect (the "**Conversion Right**") to receive shares equal to the value (as determined below) of this Warrant (or the portion thereof being canceled) by surrender of this Warrant at the principal office of the Corporation together with the properly endorsed Notice of Exercise, in which event the Corporation shall issue to the Holder a number of Exercise Shares computed using the following formula:

2

DocuSign Envelope ID: 1AF09A4D-C7FB-4793-8ABA-CD1FD5F30428

$$X = \frac{Y(A-B)}{A}$$

Where X =   the number of Exercise Shares to be issued to the Holder

     Y =   the number of Exercise Shares purchasable under the Warrant or, if only a portion of the Warrant is being exercised, the portion of the Warrant being canceled (at the date of such calculation)

     A =   the fair market value of one share of the Exercise Shares (at the date of such calculation)

     B =   Exercise Price (as adjusted to the date of such calculation)

For purposes of the above calculation, the fair market value of one share of the Exercise Shares shall be (i) in the event that this Warrant is exercised in connection with the Corporation's initial public offering of its Stock, the fair market value per share shall be price per share of the Stock sold in such initial public offering, (ii) in the event this Warrant is exercised in connection with any equity issuance or change in control transaction, the fair market value per share shall be the price per share of the Stock purchased or acquired in such issuance or transaction, or (iii) in the event this Warrant is exercised other than in connection with such events, the fair market value per share shall be determined by mutual agreement between the Corporation and the Holder, taking into consideration recent equity transactions that the Corporation may have engaged in, or failing such agreement within ten (10) business days, by a single independent third party appraiser with knowledge and experience in valuing technology companies selected by the parties or, failing agreement on such selection, appointed by and in accordance with the rules of the American Arbitration Association in Washington, DC.

**3. COVENANTS OF THE CORPORATION.**

**3.1     Representations and Warranties**.    The Corporation represents and warrants to the Holder that (i) the Corporation is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, (ii) the Corporation has all requisite corporate power and authority to own and operate its properties and assets, to carry on its business as presently conducted or presently proposed to be conducted, to issue the Warrant and to perform its obligations hereunder, and (iii) this Warrant has been duly authorized, executed and delivered by the Corporation and constitutes a valid and binding obligation of the Corporation, enforceable against it in accordance with its terms.

**3.2     Covenants as to Exercise Shares**.  The Corporation covenants and agrees that all Exercise Shares that may be issued upon the exercise of the rights represented by this Warrant will, upon issuance, be validly issued and outstanding, fully paid and nonassessable, and free from all mortgages, pledges, security interests, taxes, liens, charges or other encumbrances or charges of any kind.  The Corporation further covenants and agrees that the Corporation will at all times during the Exercise Period, have authorized

and reserved, free from preemptive rights, a sufficient number of Exercise Shares to provide for the exercise of the rights represented by this Warrant. If at any time during the Exercise Period the number of authorized but unissued Exercise Shares shall not be sufficient to permit exercise of this Warrant, the Corporation will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued Exercise Shares to such number of shares as shall be sufficient for such purposes.

**3.3    Notices of Record Date.**  In the event of any taking by the Corporation of a record of the holders of any class of securities for the purpose of determining the holders thereof who are entitled to receive any dividend (other than a cash dividend which is the same as cash dividends paid in previous quarters) or other distribution, the Corporation shall mail to the Holder, at least ten (10) days prior to the record date, a notice specifying the date on which any such record is to be taken.

**3.4    Expenses.**  In the event of a material breach by the Corporation of the terms hereof or representations made herein, the Corporation shall indemnify and reimburse the Holder for all costs and expenses (including reasonable legal fees) incurred by the Holder resulting from such breach and in connection with the enforcement of the Holder's rights under this Warrant.

**3.5    Warrant Register.**  The Corporation shall maintain, at its principal offices, a register for this Warrant, in which the Corporation shall record the name and address of the person in whose name this Warrant has been issued, as well as the name and address of each transferee and each prior owner of this Warrant.

**4.    REPRESENTATIONS OF HOLDER.**

**4.1    Acquisition of Warrant for Personal Account.**  The Holder represents and warrants that the Holder is acquiring the Warrant solely for the Holder's own account for investment and not with a view to or for sale or distribution of said Warrant or any part thereof, other than potential transfers between affiliates (including affiliate funds). The Holder also represents that the entire legal and beneficial interests of the Warrant and Exercise Shares the Holder is acquiring is being acquired for, and will be held for, the Holder's own account only.

**4.2    Securities Are Not Registered.**

**(a)**    The Holder understands that the Warrant and the Exercise Shares have not been registered under the Securities Act of 1933, as amended (the "**Act**") on the basis that no distribution or public offering of the stock of the Corporation is to be effected. The Holder realizes that the basis for the exemption may not be present if, notwithstanding the Holder's representations, the Holder has a present intention of acquiring the securities for a fixed or determinable period in the future, selling (in connection with a distribution or otherwise), granting any participation in, or otherwise distributing the securities. The Holder has no such present intention.

**(b)** The Holder recognizes that the Warrant and the Exercise Shares must be held indefinitely unless they are subsequently registered under the Act or an exemption from such registration is available.

**(c)** The Holder is aware that neither the Warrant nor the Exercise Shares may be sold pursuant to Rule 144 adopted under the Act unless certain conditions are met, including, among other things, the existence of a public market for the shares, the availability of certain current public information about the Corporation, the resale following the required holding period under Rule 144 and the number of shares being sold during any three month period not exceeding specified limitations.  The Holder is aware that the conditions for resale set forth in Rule 144 have not been satisfied and that the Corporation has no plans to satisfy these conditions in the foreseeable future.

### 4.3   Disposition of Warrant and Exercise Shares.

**(a)** The Holder further agrees not to make any disposition of all or any part of the Warrant or Exercise Shares in any event unless and until:

**(i)** There is then in effect a registration statement under the Act covering such proposed disposition and such disposition is made in accordance with said registration statement; or

**(ii)** The Holder shall have notified the Corporation of the proposed disposition and shall have furnished the Corporation with an opinion of counsel reasonably satisfactory to the Corporation that no registration is required in connection with such disposition, including a statement of the circumstances surrounding the proposed disposition; provided, however, that such opinion and statement will not be required if the disposition is permitted under Rule 144 under the Act.

**(b)** In addition, the Holder agrees not to sell this Warrant or the Exercise Shares during a period specified by the representative of the underwriters of Stock (not to exceed one hundred eighty (180) days) following the effective date of the initial registration statement of the Corporation filed under the Act, so long as all officers, directors, and stockholder beneficially owning one percent (1%) or more of the outstanding Stock have executed similar agreements and are similarly restricted from selling the Corporation's stock.

**(c)** Notwithstanding the provisions of paragraphs (a) and (b) above, the Holder may transfer, convey or assign this Warrant and the Exercise Shares to (i) any affiliate, member, shareholder, officer, or director of Holder, (ii) any successor entity in connection with any merger, consolidation, reorganization, change in control, or any sale of all or substantially all of the Holder's assets, or (iii) in the event the Holder is a natural person, any immediate family member of the Holder or any trust or other entity formed primarily for the benefit of the Holder or his/her immediate family member(s); provided

that the Corporation is given written notice thereof and any such transferee agrees to be bound by the terms hereof.

(d)     Subject to the requirements of this Section 4.3, upon the Corporation's receipt of an assignment, in the form attached hereto as Exhibit B, the Corporation will issue, in whole or in part (i) a new Warrant including the same terms as set forth herein to the Holder's assignee for the Exercise Shares so transferred or assigned, and (ii) a new Warrant including the same terms as set forth herein to the Holder for the remaining Exercise Shares.

**5.**     ADJUSTMENT OF EXERCISE PRICE; EFFECT OF ORGANIC CHANGES.

**5.1     Adjustment of Exercise Price.**  In the event of changes in the outstanding Exercise Shares by reason of stock dividends, splits, recapitalizations, reclassifications, combinations or exchanges of shares, separations, reorganizations, liquidations, or the like, the number and class of shares available under the Warrant in the aggregate and the Exercise Price shall be correspondingly adjusted to give the Holder of the Warrant, on exercise for the same aggregate Exercise Price, the total number, class, and kind of shares as the Holder would have owned had the Warrant been exercised prior to the event and had the Holder continued to hold such shares until after the event requiring adjustment. The form of this Warrant need not be changed because of any adjustment in the number of Exercise Shares subject to this Warrant.

**5.2     Early Termination.**  In the event of, at any time during the Exercise Period, an initial public offering of securities of the Corporation registered under the Act, or any capital reorganization, or any reclassification of the capital stock of the Corporation (other than a change in par value or from par value to no par value or no par value to par value or as a result of a stock dividend or subdivision, split-up or combination of shares), or the consolidation or merger of the Corporation with or into another corporation (other than a merger solely to effect a reincorporation of the Corporation into another state), or the sale or other disposition of all or substantially all the properties and assets of the Corporation in its entirety to any other person, the Corporation shall provide to the Holder thirty (30) days advance written notice of such public offering, reorganization, reclassification, consolidation, merger or sale or other disposition of the Corporation's assets, and this Warrant shall terminate unless exercised prior to the date such public offering is closed or the occurrence of such reorganization, reclassification, consolidation, merger or sale or other disposition of the Corporation's assets provided, however, that in the event that this Warrant would have otherwise terminated pursuant to Section 5.2, it shall be deemed to have been exercised pursuant to Section 2.1 above immediately prior to the consummation of such transaction and Holder shall be deemed to have issued the number of shares, if any, issuable thereunder immediately prior to the consummation of such transaction.

**5.3     Anti-Dilution Adjustment**. If the Company, at any time while this Warrant, or any portion thereof, remains outstanding and unexpired issues any equity securities or capital shares or any security convertible into equity securities or capital shares of the Company, or otherwise engages in any transaction or series of transactions resulting in

early termination under Section 5.2 above, in exchange for consideration reflecting less than a $10 Million pre-money valuation for all of the capital shares or equity interests of the Company determined on a fully-diluted basis (the "Lower Valuation"), then the Exercise Price shall be proportionally adjusted downward to an Exercise Price reflecting the Lower Valuation.

**6.** **NO VOTING RIGHTS.** This Warrant in and of itself shall not entitle the Holder to any voting rights as a stockholder of the Corporation.

**7.** **CERTAIN HOLDER RIGHTS.**

**7.1** **Information Rights**. For so long this Warrant remains outstanding:

**(a)** The Corporation will maintain true books and records of account in which full and correct entries will be made of all its business transactions pursuant to a system of accounting established and administered in accordance with generally accepted accounting principles consistently applied (except as noted therein or as disclosed to the recipients thereof), and will set aside on its books all such proper accruals and reserves as will be required under generally accepted accounting principles consistently applied.

**(b)** As soon as practicable after the end of each fiscal year of the Corporation, and in any event within one hundred twenty (120) days thereafter, the Corporation will furnish to Holder a balance sheet of the Corporation, as at the end of such fiscal year, and a statement of income and a statement of cash flows of the Corporation, for such year, all prepared in accordance with generally accepted accounting principles consistently applied (except as noted therein or as disclosed to the recipients thereof) and setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail. If such financial statements are audited, they will be accompanied with a report and opinion thereon by independent public accountants of national standing selected by the Corporation's Board of Directors. If unaudited, such statements will be accompanied by a brief written summary prepared by the Corporation's Chief Executive Officer summarizing performance, variances from budget and an outlook for the ensuing period.

**(c)** As soon as practicable after the end of the first, second and third quarterly accounting periods in each fiscal year of the Corporation, and in any event within thirty (30) days thereafter, the Corporation will furnish to the Holder an unaudited balance sheet of the Corporation as of the end of each such quarterly period, and a statement of income and a statement of cash flows of the Corporation for such period and for the current fiscal year to date, prepared in accordance with generally accepted accounting principles consistently applied (except as noted therein), with the exception that no notes need be attached to such statements and year-end audit adjustments may not have been made. Such statements will be accompanied by a brief written summary prepared by the Corporation's Chief Executive Officer summarizing performance, variances from budget and an outlook for the ensuing period.

**7.2    Inspection Rights.**  The Holder will have the periodic right to visit and inspect any of the properties of the Corporation or any of its subsidiaries, and to discuss the affairs, finances and accounts of the Corporation or any of its subsidiaries with its officers, and to review such information as is reasonably requested all at such reasonable times and as often as may be reasonably requested; *provided, however,* that the Corporation will not be obligated under this Section 7.3 with respect to a competitor of the Corporation or with respect to information which the Board of Directors determines in good faith is confidential or attorney-client privileged and should not, therefore, be disclosed.

**8.     LOST, STOLEN, MUTILATED OR DESTROYED WARRANT.**  The Corporation covenants to the Holder that, upon receipt of evidence reasonably satisfactory to the Corporation of the loss, theft, destruction or mutilation of this Warrant or any stock certificate and, in the case of any such loss, theft or destruction, upon receipt of an indemnity reasonably satisfactory to the Corporation, or in the case of any such mutilation, upon surrender and cancellation of this Warrant or stock certificate, the Corporation will make and deliver a new warrant or stock certificate, of like tenor, in lieu of the lost, stolen, destroyed or mutilated Warrant or stock certificate.

**9.     NOTICES, ETC.**  Any notice required or permitted under this Warrant shall be given in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient; if not, then on the next business day, (c) five (5) business days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.  All communications shall be sent to the Holder and to the Corporation at the respective address set forth above, or at such other address as the Holder or the Corporation, as applicable, may designate by ten (10) days advance written notice to the other parties hereto.

**10.     ACCEPTANCE.**  Receipt of this Warrant by the Holder shall constitute acceptance of and agreement to all of the terms and conditions contained herein.

**11.     GOVERNING LAW.**  This Warrant and all rights, obligations and liabilities hereunder shall be governed by the laws of the State of Delaware without regard to the law of conflicts thereof.

**12.     ENTIRE AGREEMENT.**  This Warrant contains the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions (both oral and written) between the parties with respect to the subject matter hereof.

**13.     SUCCESSORS AND ASSIGNS.**  This Warrant shall be binding on, and shall inure to the benefit of, the Corporation and the Holder and their respective successors and assigns.

**14.** **SURVIVAL.**  The representations, warranties and covenants made by the parties hereto shall survive the execution and delivery of this Agreement.

**[SIGNATURE PAGE TO FOLLOW]**

In Witness Whereof, the Holder and the Corporation have caused this Warrant to be executed by their duly authorized officers as of the date first written above.

**LVH GLOBAL, INC.**

By: _____
Name:  Amir Benish
Title:    Founder & CEO

Agreed and Acknowledged:

**TBD**

By: _____
Name: **David Warschawski**

**NOTICE OF EXERCISE**

TO: LVH Global, Inc.

(1)         The undersigned hereby elects to purchase _____ shares of _____ of LVH Global, Inc. (the "**Corporation**") pursuant to the terms of the attached Warrant, and tenders herewith payment of the exercise price in full, together with all applicable transfer taxes, if any.

☐         The undersigned hereby elects to purchase _____ shares of _____ of the Corporation pursuant to the terms of the net exercise provisions set forth in Section 2.1 of the attached Warrant, and shall tender payment of all applicable transfer taxes, if any.

(2)         Please issue a certificate or certificates representing said shares of _____ in the name of the undersigned or in such other name as is specified below:

**▬▬▬▬▬▬▬▬▬▬▬▬**
(Name)

**▬▬▬▬▬▬▬▬▬▬▬▬**

**▬▬▬▬▬▬▬▬▬▬▬▬**
(Address)

(3)         The undersigned represents that (i) the aforesaid shares are being acquired for the account of the undersigned for investment and not with a view to, or for resale in connection with, the distribution thereof and that the undersigned has no present intention of distributing or reselling such shares; (ii) the undersigned is experienced in making investments of this type and has such knowledge and background in financial and business matters that the undersigned is capable of evaluating the merits and risks of this investment and protecting the undersigned's own interests; (iii) the undersigned is an "accredited investor" (as defined in Rule 501 promulgated pursuant to the Securities Act); and (iv) the undersigned agrees not to make any disposition of all or any part of the aforesaid shares unless and until there is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with said registration statement, or the undersigned has provided the Corporation with an opinion of counsel reasonably satisfactory to the Corporation, stating that such registration is not required.


(Date)                                                  (Signature)


                                                        (Print name)

## ASSIGNMENT FORM

(To assign the foregoing Warrant, execute this form and supply required information.  Do not use this form to purchase shares.)

WARRANT DESCRIPTION:  [_____]

FOR VALUE RECEIVED, the foregoing Warrant with respect to [_____] shares of the Corporation and all rights evidenced thereby are hereby assigned to

Name: _____

(Please Print)

Address: _____

(Please Print)

Dated: _____, 2__

Holder's
Signature: _____

Holder's
Address: _____

**Exhibit B.2**

THIS INSTRUMENT AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

**LVH GLOBAL, INC.**

**SAFE**
**(Simple Agreement for Future Equity)**

THIS CERTIFIES THAT in exchange for the payment by **David Warschawski**, a natural person (the "**Investor**") of **$15,000.00** (the "**Purchase Amount**"), effective as of March 13, 2019, LVH Global, Inc., a Delaware corporation (the "**Company**"), hereby issues to the Investor the right to certain shares of the Company's capital stock, subject to the terms set forth below.

The "**Valuation Cap**" is $15 Million.

The "**Discount Rate**" is 100% minus 20% = 80%.

See **Section 2** for certain additional defined terms.

**1.** *Events*

(a) **Equity Financing**. If there is an Equity Financing before the expiration or termination of this instrument, the Company will automatically issue to the Investor a number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Conversion Price. In connection with the issuance of Safe Preferred Stock by the Company to the Investor pursuant to this Section 1(a):

(i) The Investor will execute and deliver to the Company all transaction documents related to the Equity Financing; *provided,* that such documents are the same documents to be entered into with the purchasers of Standard Preferred Stock, with appropriate variations for the Safe Preferred Stock if applicable, and *provided further,* that such documents have customary exceptions to any drag-along applicable to the Investor, including, without limitation, limited representations and warranties and limited liability and indemnification obligations on the part of the Investor; and

(ii) The Investor and the Company will execute a Pro Rata Rights Agreement, unless the Investor is already included in such rights in the transaction documents related to the Equity Financing.

(b) **Liquidity Event**. If there is a Liquidity Event before the expiration or termination of this instrument, the Investor will, at its option, either (i) receive a cash payment equal to 1.5 times the Purchase Amount (subject to the following paragraph) or (ii) automatically receive from the Company a number of shares of Common Stock equal to the Purchase Amount times 1.5, then divided by the Liquidity Price, if the Investor fails to select the cash option.

In connection with Section (b)(i), the Purchase Amount will be due and payable by the Company to the Investor immediately prior to, or concurrent with, the consummation of the Liquidity Event. If there are not enough funds to pay the Investor and holders of other Safes (collectively, the "**Cash-Out Investors**") in full, then all of the Company's available funds will be distributed with equal priority and *pro rata* among the Cash-Out Investors in proportion to their Purchase Amounts, and the Cash-Out Investors will automatically receive the number of shares of Common Stock equal to the remaining unpaid Purchase Amount divided by the Liquidity Price. In connection with a Change of Control intended to qualify as a tax-free reorganization, the Company may reduce, *pro rata*, the Purchase Amounts payable to the Cash-Out Investors by the amount determined by its board of directors in good faith to be advisable for such Change of Control to qualify as a tax-free reorganization for U.S. federal income tax purposes, and in such case, the Cash-Out Investors will automatically receive the number of shares of Common Stock equal to the remaining unpaid Purchase Amount divided by the Liquidity Price.

(c) **Dissolution Event**. If there is a Dissolution Event before this instrument expires or terminates, the Company will pay an amount equal to the Purchase Amount times 1.5, due and payable to the Investor immediately prior to, or concurrent with, the consummation of the Dissolution Event. The Purchase Amount will be paid prior and in preference to any Distribution of any of the assets of the Company to holders of outstanding Capital Stock by reason of their ownership thereof. If immediately prior to the consummation of the Dissolution Event, the assets of the Company legally available for distribution to the Investor and all holders of all other Safes (the "**Dissolving Investors**"), as determined in good faith by the Company's board of directors, are insufficient to permit the payment to the Dissolving Investors of their respective Purchase Amounts, then the entire assets of the Company legally available for distribution will be distributed with equal priority and *pro rata* among the Dissolving Investors in proportion to the Purchase Amounts they would otherwise be entitled to receive pursuant to this Section 1(c).

(d) **Lack of Equity Financing, Liquidity Event, or Dissolution Event.** In the event that, as of 18 months from the

effective date of this SAFE, there has been no Equity Financing, Liquidity Event, or Dissolution Event, the Purchase Amount hereunder, times 1.5, will be due and payable in cash, or convert at the option of the holder, into a class of shares of Preferred Stock having the conversion price and  substantially the rights, preferences, and obligations as are described on Exhibit A attached hereto.  In connection with and as a condition to such conversion, the Investor will execute and deliver to the Company all transaction documents in a form that are customarily used in connection with the sale of a class or series of preferred stock, including limited investment and other representations from the Investor and indemnification obligations on the part of the Investor related thereto.

     (d)  **Lack of Equity Financing, Liquidity Event, or Dissolution Event.**

     (e)  **Termination**.  This instrument will expire and terminate (without relieving the Company of any obligations arising from a prior breach of or non-compliance with this instrument) upon either (i) the issuance of stock to the Investor pursuant to Section 1(a) or Section 1(b)(ii) or Section 1(d); or (ii) the payment, or setting aside for payment, of amounts due the Investor pursuant to Section 1(b)(i) or Section 1(c).

2.    *Definitions*

"**Capital Stock**" means the capital stock of the Company, including, without limitation, the "**Common Stock**" and the "**Preferred Stock.**"

"**Change of Control**" means (i) a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Company's board of directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

"**Company Capitalization**" means the **sum**, as of immediately prior to the Equity Financing, of: (**1**) all shares of Capital Stock (on an as-converted basis) issued and outstanding, assuming exercise or conversion of all outstanding vested and unvested options, warrants and other convertible securities, but excluding (A) this instrument, (B) all other Safes, and (C) convertible promissory notes; **and** (**2**) all shares of Common Stock reserved and available for future grant under any equity incentive or similar plan of the Company, and/or any equity incentive or similar plan to be created or increased in connection with the Equity Financing.

"**Conversion Price**" means the either: (1) the Safe Price or (2) the Discount Price, whichever calculation results in a greater number of shares of Safe Preferred Stock.

"**Discount Price**" means the price per share of the Standard Preferred Stock sold in the Equity Financing multiplied by the Discount Rate.

"**Distribution**" means the transfer to holders of Capital Stock by reason of their ownership thereof of cash or other property without consideration whether by way of dividend or otherwise, other than dividends on Common Stock payable in Common Stock, or the purchase or redemption of Capital Stock by the Company or its subsidiaries for cash or property other than: (i) repurchases of Common Stock held by employees, officers, directors or consultants of the Company or its subsidiaries pursuant to an agreement providing, as applicable, a right of first refusal or a right to repurchase shares upon termination of such service provider's employment or services; or (ii) repurchases of Capital Stock in connection with the settlement of disputes with any stockholder.

"**Dissolution Event**" means (i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (**excluding** a Liquidity Event), whether voluntary or involuntary.

"**Equity Financing**" means a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Stock at a fixed pre-money valuation resulting in gross proceeds to the Company of at least $2,000,000 or such lower amount as may be approved in writing by the holders of a majority of all Safes issued by the Company.

"**Initial Public Offering**" means the closing of the Company's first firm commitment underwritten initial public offering of Common Stock pursuant to a registration statement filed under the Securities Act.

"**Liquidity Capitalization**" means the number, as of immediately prior to the Liquidity Event, of shares of Capital Stock (on an as-converted basis) outstanding, assuming exercise or conversion of all outstanding vested and unvested options, warrants and other convertible securities, but **excluding**: (i) shares of Common Stock reserved and available for future grant under any equity incentive or similar

plan; (ii) this instrument; (iii) other Safes; and (iv) convertible promissory notes.

"**Liquidity Event**" means a Change of Control or an Initial Public Offering.

"**Liquidity Price**" means the price per share equal to the Valuation Cap divided by the Liquidity Capitalization.

"**Pro Rata Rights Agreement**" means a written agreement between the Company and the Investor (and holders of other Safes, as appropriate) giving the Investor a right to purchase its *pro rata* share of private placements of securities by the Company **occurring after the Equity Financing**, subject to customary exceptions. *Pro rata* for purposes of the Pro Rata Rights Agreement will be calculated based on the ratio of (1) the number of shares of Capital Stock owned by the Investor immediately prior to the issuance of the securities to (2) the total number of shares of outstanding Capital Stock on a fully diluted basis, calculated as of immediately prior to the issuance of the securities.

"**Safe**" means an instrument containing a future right to shares of Capital Stock, similar in form and content to this instrument, purchased by investors for the purpose of funding the Company's business operations.

"**Safe Preferred Stock**" means the shares of a series of Preferred Stock issued to the Investor in an Equity Financing, having the identical rights, privileges, preferences and restrictions as the shares of Standard Preferred Stock, other than with respect to: (i) the per share liquidation preference and the conversion price for purposes of price-based anti-dilution protection, which will equal the Conversion Price; and (ii) the basis for any dividend rights, which will be based on the Conversion Price.

"**Safe Price**" means the price per share equal to the Valuation Cap divided by the Company Capitalization.

"**Standard Preferred Stock**" means the shares of a series of Preferred Stock issued to the investors investing new money in the Company in connection with the initial closing of the Equity Financing.

3.      *Company Representations*

(a)      The Company is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

(b)      The execution, delivery and performance by the Company of this instrument is within the power of the Company and, other than with respect to the actions to be taken when equity is to be issued to the Investor, has been duly authorized by all necessary actions on the part of the Company. This instrument constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity. To the knowledge of the Company, it is not in violation of (i) its current certificate of incorporation or bylaws, (ii) any material statute, rule or regulation applicable to the Company or (iii) any material indenture or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(c)      The performance and consummation of the transactions contemplated by this instrument do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material indenture or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien upon any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

(d)      No consents or approvals are required in connection with the performance of this instrument, other than: (i) the Company's corporate approvals; (ii) any qualifications or filings under applicable securities laws; and (iii) necessary corporate approvals for the authorization of Capital Stock issuable pursuant to Section 1.

(e)      To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others.

4.      *Investor Representations*

(a)      The Investor has full legal capacity, power and authority to execute and deliver this instrument and to perform its obligations hereunder. This instrument constitutes valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b)      The Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act. The Investor has been advised that this instrument and the underlying securities have not been registered under the Securities Act, or any state

3

securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Investor is purchasing this instrument and the securities to be acquired by the Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.

5.    ***Miscellaneous***

(a)    Any provision of this instrument may be amended, waived or modified only upon the written consent of the Company and the Investor.

(b)    Any notice required or permitted by this instrument will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed on the signature page, as subsequently modified by written notice.

(c)    The Investor is not entitled, as a holder of this instrument, to vote or receive dividends or be deemed the holder of Capital Stock for any purpose, nor will anything contained herein be construed to confer on the Investor, as such, any of the rights of a stockholder of the Company or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings, or to receive subscription rights or otherwise until shares have been issued upon the terms described herein.

(d)    Neither this instrument nor the rights contained herein may be assigned, by operation of law or otherwise, by either party without the prior written consent of the other; *provided, however*, that this instrument and/or the rights contained herein may be assigned without the Company's consent by the Investor to any other entity who directly or indirectly, controls, is controlled by or is under common control with the Investor, including, without limitation, any general partner, managing member, officer or director of the Investor, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, the Investor; and *provided, further*, that the Company may assign this instrument in whole, without the consent of the Investor, in connection with a reincorporation to change the Company's domicile.

(e)    In the event any one or more of the provisions of this instrument is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this instrument operate or would prospectively operate to invalidate this instrument, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this instrument and the remaining provisions of this instrument will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

(f)    All rights and obligations hereunder will be governed by the laws of the State of Delaware, without regard to the conflicts of law provisions of such jurisdiction, and the venue for any dispute resolution shall be the Borough of Manhattan, New York City, New York State.

[SIGNATURE PAGE FOLLOWS]

4

IN WITNESS WHEREOF, the undersigned have caused this instrument to be duly executed and delivered.

**LVH GLOBAL, INC.**

By:   Amir Benish
    Founder & CEO

Address:  505 Fifth Avenue, Suite 1502
    New York, NY 10017

Email:   amir@lvhglobal.com

**INVESTOR:** David Warschawski

Signature:

Address:  1501 Sulgrave Ave.,

    Suite 350 Baltimore, MD

    21209

Email:   David.Warschawski@warschawski.com

# Exhibit A

This Exhibit A summarizes the terms by which the Investor may receive shares of Preferred Stock in the Company pursuant to Section 1(d) of this SAFE.

**Liquidation Preference:** 1.5 times the original issue price plus declared but unpaid dividends on each share of Preferred Stock. After the payment of the foregoing amount, the remaining assets or property distributable upon such liquidation shall be divided pro rata among the holders of the Common Stock and the Preferred Stock. A merger, reorganization or similar transaction will be treated as a liquidation unless otherwise agreed by the holders of a majority in interest of the Preferred Stock.

**Conversion price:** If the Investor chooses the option described under Section 1(d), SAFE interests are convertible into Preferred Shares , at a price per share of the Preferred Stock determined by dividing the Valuation Cap by the total number of shares of the Company's capital stock outstanding immediately prior to such conversion.

**Participation Rights:** Preferred shareholders will be entitled to invest in the Company's next equity or hybrid debt/equity investment round (the "New Round") on the same terms and conditions as the other investors in that New Round. A "Next Round" shall be defined as the next Offering of equity or hybrid debt/equity, if that round has a minimum size of at least $1 million. The maximum amount that each Investor may invest in a New Round will be such that, after accounting for dilution from the New Round, the Investor will hold an ownership percentage in the Company equal to the percentage ownership that the Investor held at the completion of this Offering (including conversion of any Preferred shares but not including the effects of exercise of any warrants or options outstanding).

**Negative covenants:** Approval of over 50% of the shares of Preferred Stock required to (i) adversely change rights of the Preferred Stock; (ii) change the authorized number of shares; (iii) authorize a new series of Preferred Stock having rights senior to or on parity with the Preferred Stock; and (iv) increase the cash compensation level (including salary and bonus) of any Founder of the Company more than twenty-five percent (25%) from current levels.

**Founders** The Founders are defined to be Mr. Amir Benesh and Mr. Hugh Barton.

**Present LVH Capitalization:** The Company has issued a total of 5,000,000 shares, all of which are common stock. Under its revised Certification of Incorporation in the State of Delaware, dated 3/29/2017, the Company has authorization to issue up to 2,000,000 preferred shares (as well as up to 5,000,000 more common shares). If the operation of Section 1(d) of this SAFE required revision of the Certificate to authorize additional preferred shares, the Company pledges that it would take such action.

**Cashless exchange:** These transactions pursuant to Section 1(d) would be cash neutral, in the sense that they represent the conversion of SAFE interests into Preferred Shares, without the exchange of any cash.

**Exhibit B.3**

THIS INSTRUMENT AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

**LVH GLOBAL, INC.**

**SAFE**
**(Simple Agreement for Future Equity)**

THIS CERTIFIES THAT in exchange for the payment by **David Warschawski**, a natural person (the "**Investor**") of **$45,000.00** (the "**Purchase Amount**"), effective as of May__, 2019, LVH Global, Inc., a Delaware corporation (the "**Company**"), hereby issues to the Investor the right to certain shares of the Company's capital stock, subject to the terms set forth below.

The "**Valuation Cap**" is $15 Million.

The "**Discount Rate**" is 100% minus 20% = 80%.

See **Section 2** for certain additional defined terms.

1.      *Events*

(a)      **Equity Financing**. If there is an Equity Financing before the expiration or termination of this instrument, the Company will automatically issue to the Investor a number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Conversion Price. In connection with the issuance of Safe Preferred Stock by the Company to the Investor pursuant to this Section 1(a):

(i)      The Investor will execute and deliver to the Company all transaction documents related to the Equity Financing; *provided,* that such documents are the same documents to be entered into with the purchasers of Standard Preferred Stock, with appropriate variations for the Safe Preferred Stock if applicable, and *provided further,* that such documents have customary exceptions to any drag-along applicable to the Investor, including, without limitation, limited representations and warranties and limited liability and indemnification obligations on the part of the Investor; and

(ii)      The Investor and the Company will execute a Pro Rata Rights Agreement, unless the Investor is already included in such rights in the transaction documents related to the Equity Financing.

(b)      **Liquidity Event**. If there is a Liquidity Event before the expiration or termination of this instrument, the Investor will, at its option, either (i) receive a cash payment equal to 1.5 times the Purchase Amount (subject to the following paragraph) or (ii) automatically receive from the Company a number of shares of Common Stock equal to the Purchase Amount times 1.5, then divided by the Liquidity Price, if the Investor fails to select the cash option.

In connection with Section (b)(i), the Purchase Amount will be due and payable by the Company to the Investor immediately prior to, or concurrent with, the consummation of the Liquidity Event. If there are not enough funds to pay the Investor and holders of other Safes (collectively, the "**Cash-Out Investors**") in full, then all of the Company's available funds will be distributed with equal priority and *pro rata* among the Cash-Out Investors in proportion to their Purchase Amounts, and the Cash-Out Investors will automatically receive the number of shares of Common Stock equal to the remaining unpaid Purchase Amount divided by the Liquidity Price. In connection with a Change of Control intended to qualify as a tax-free reorganization, the Company may reduce, *pro rata*, the Purchase Amounts payable to the Cash-Out Investors by the amount determined by its board of directors in good faith to be advisable for such Change of Control to qualify as a tax-free reorganization for U.S. federal income tax purposes, and in such case, the Cash-Out Investors will automatically receive the number of shares of Common Stock equal to the remaining unpaid Purchase Amount divided by the Liquidity Price.

(c)      **Dissolution Event**. If there is a Dissolution Event before this instrument expires or terminates, the Company will pay an amount equal to the Purchase Amount times 1.5, due and payable to the Investor immediately prior to, or concurrent with, the consummation of the Dissolution Event. The Purchase Amount will be paid prior and in preference to any Distribution of any of the assets of the Company to holders of outstanding Capital Stock by reason of their ownership thereof. If immediately prior to the consummation of the Dissolution Event, the assets of the Company legally available for distribution to the Investor and all holders of all other Safes (the "**Dissolving Investors**"), as determined in good faith by the Company's board of directors, are insufficient to permit the payment to the Dissolving Investors of their respective Purchase Amounts, then the entire assets of the Company legally available for distribution will be distributed with equal priority and *pro rata* among the Dissolving Investors in proportion to the Purchase Amounts they would otherwise be entitled to receive pursuant to this Section 1(c).

(d)      **Lack of Equity Financing, Liquidity Event, or Dissolution Event.** In the event that, as of 18 months from the

1

effective date of this SAFE, there has been no Equity Financing, Liquidity Event, or Dissolution Event, the Purchase Amount hereunder, times 1.5, will be due and payable in cash, or convert at the option of the holder, into a class of shares of Preferred Stock having the conversion price and  substantially the rights, preferences, and obligations as are described on Exhibit A attached hereto.  In connection with and as a condition to such conversion, the Investor will execute and deliver to the Company all transaction documents in a form that are customarily used in connection with the sale of a class or series of preferred stock, including limited investment and other representations from the Investor and indemnification obligations on the part of the Investor related thereto.

(d)  **Lack of Equity Financing, Liquidity Event, or Dissolution Event.**

(e)  **Termination**.  This instrument will expire and terminate (without relieving the Company of any obligations arising from a prior breach of or non-compliance with this instrument) upon either (i) the issuance of stock to the Investor pursuant to Section 1(a) or Section 1(b)(ii) or Section 1(d); or (ii) the payment, or setting aside for payment, of amounts due the Investor pursuant to Section 1(b)(i) or Section 1(c).

2.  *Definitions*

"**Capital Stock**" means the capital stock of the Company, including, without limitation, the "**Common Stock**" and the "**Preferred Stock**."

"**Change of Control**" means (i) a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Company's board of directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

"**Company Capitalization**" means the **sum**, as of immediately prior to the Equity Financing, of: (**1**) all shares of Capital Stock (on an as-converted basis) issued and outstanding, assuming exercise or conversion of all outstanding vested and unvested options, warrants and other convertible securities, but excluding (A) this instrument, (B) all other Safes, and (C) convertible promissory notes; **and** (**2**) all shares of Common Stock reserved and available for future grant under any equity incentive or similar plan of the Company, and/or any equity incentive or similar plan to be created or increased in connection with the Equity Financing.

"**Conversion Price**" means the either: (1) the Safe Price or (2) the Discount Price, whichever calculation results in a greater number of shares of Safe Preferred Stock.

"**Discount Price**" means the price per share of the Standard Preferred Stock sold in the Equity Financing multiplied by the Discount Rate.

"**Distribution**" means the transfer to holders of Capital Stock by reason of their ownership thereof of cash or other property without consideration whether by way of dividend or otherwise, other than dividends on Common Stock payable in Common Stock, or the purchase or redemption of Capital Stock by the Company or its subsidiaries for cash or property other than: (i) repurchases of Common Stock held by employees, officers, directors or consultants of the Company or its subsidiaries pursuant to an agreement providing, as applicable, a right of first refusal or a right to repurchase shares upon termination of such service provider's employment or services; or (ii) repurchases of Capital Stock in connection with the settlement of disputes with any stockholder.

"**Dissolution Event**" means (i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (**excluding** a Liquidity Event), whether voluntary or involuntary.

"**Equity Financing**" means a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Stock at a fixed pre-money valuation resulting in gross proceeds to the Company of at least $2,000,000 or such lower amount as may be approved in writing by the holders of a majority of all Safes issued by the Company.

"**Initial Public Offering**" means the closing of the Company's first firm commitment underwritten initial public offering of Common Stock pursuant to a registration statement filed under the Securities Act.

"**Liquidity Capitalization**" means the number, as of immediately prior to the Liquidity Event, of shares of Capital Stock (on an as-converted basis) outstanding, assuming exercise or conversion of all outstanding vested and unvested options, warrants and other convertible securities, but **excluding**: (i) shares of Common Stock reserved and available for future grant under any equity incentive or similar

2

plan; (ii) this instrument; (iii) other Safes; and (iv) convertible promissory notes.

"**Liquidity Event**" means a Change of Control or an Initial Public Offering.

"**Liquidity Price**" means the price per share equal to the Valuation Cap divided by the Liquidity Capitalization.

"**Pro Rata Rights Agreement**" means a written agreement between the Company and the Investor (and holders of other Safes, as appropriate) giving the Investor a right to purchase its *pro rata* share of private placements of securities by the Company **occurring after the Equity Financing**, subject to customary exceptions. *Pro rata* for purposes of the Pro Rata Rights Agreement will be calculated based on the ratio of (1) the number of shares of Capital Stock owned by the Investor immediately prior to the issuance of the securities to (2) the total number of shares of outstanding Capital Stock on a fully diluted basis, calculated as of immediately prior to the issuance of the securities.

"**Safe**" means an instrument containing a future right to shares of Capital Stock, similar in form and content to this instrument, purchased by investors for the purpose of funding the Company's business operations.

"**Safe Preferred Stock**" means the shares of a series of Preferred Stock issued to the Investor in an Equity Financing, having the identical rights, privileges, preferences and restrictions as the shares of Standard Preferred Stock, other than with respect to: (i) the per share liquidation preference and the conversion price for purposes of price-based anti-dilution protection, which will equal the Conversion Price; and (ii) the basis for any dividend rights, which will be based on the Conversion Price.

"**Safe Price**" means the price per share equal to the Valuation Cap divided by the Company Capitalization.

"**Standard Preferred Stock**" means the shares of a series of Preferred Stock issued to the investors investing new money in the Company in connection with the initial closing of the Equity Financing.

3.      *Company Representations*

(a)      The Company is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

(b)      The execution, delivery and performance by the Company of this instrument is within the power of the Company and, other than with respect to the actions to be taken when equity is to be issued to the Investor, has been duly authorized by all necessary actions on the part of the Company. This instrument constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity. To the knowledge of the Company, it is not in violation of (i) its current certificate of incorporation or bylaws, (ii) any material statute, rule or regulation applicable to the Company or (iii) any material indenture or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(c)      The performance and consummation of the transactions contemplated by this instrument do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material indenture or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien upon any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

(d)      No consents or approvals are required in connection with the performance of this instrument, other than: (i) the Company's corporate approvals; (ii) any qualifications or filings under applicable securities laws; and (iii) necessary corporate approvals for the authorization of Capital Stock issuable pursuant to Section 1.

(e)      To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others.

4.      *Investor Representations*

(a)      The Investor has full legal capacity, power and authority to execute and deliver this instrument and to perform its obligations hereunder. This instrument constitutes valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b)      The Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act. The Investor has been advised that this instrument and the underlying securities have not been registered under the Securities Act, or any state

3

securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Investor is purchasing this instrument and the securities to be acquired by the Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.

5.     ***Miscellaneous***

(a)     Any provision of this instrument may be amended, waived or modified only upon the written consent of the Company and the Investor.

(b)     Any notice required or permitted by this instrument will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed on the signature page, as subsequently modified by written notice.

(c)     The Investor is not entitled, as a holder of this instrument, to vote or receive dividends or be deemed the holder of Capital Stock for any purpose, nor will anything contained herein be construed to confer on the Investor, as such, any of the rights of a stockholder of the Company or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings, or to receive subscription rights or otherwise until shares have been issued upon the terms described herein.

(d)     Neither this instrument nor the rights contained herein may be assigned, by operation of law or otherwise, by either party without the prior written consent of the other; *provided, however*, that this instrument and/or the rights contained herein may be assigned without the Company's consent by the Investor to any other entity who directly or indirectly, controls, is controlled by or is under common control with the Investor, including, without limitation, any general partner, managing member, officer or director of the Investor, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, the Investor; and *provided, further*, that the Company may assign this instrument in whole, without the consent of the Investor, in connection with a reincorporation to change the Company's domicile.

(e)     In the event any one or more of the provisions of this instrument is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this instrument operate or would prospectively operate to invalidate this instrument, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this instrument and the remaining provisions of this instrument will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

(f)     All rights and obligations hereunder will be governed by the laws of the State of Delaware, without regard to the conflicts of law provisions of such jurisdiction, and the venue for any dispute resolution shall be the Borough of Manhattan, New York City, New York State.

[SIGNATURE PAGE FOLLOWS]

4

IN WITNESS WHEREOF, the undersigned have caused this instrument to be duly executed and delivered.

**LVH GLOBAL, INC.**

By:          Amir Benesh
                   Founder & CEO

Address:     505 Fifth Avenue, Suite 1502
                   New York, NY 10017

Email:       amir@lvhglobal.com

**INVESTOR:**   David Warschawski

Signature:      _____

Address:      1501 Sulgrave Ave.,

                 Suite 350 Baltimore, MD

                 21209

Email:       David.Warschawski@warschawski.com

# Exhibit A

This Exhibit A summarizes the terms by which the Investor may receive shares of Preferred Stock in the Company pursuant to Section 1(d) of this SAFE.

**Liquidation Preference:** 1.5 times the original issue price plus declared but unpaid dividends on each share of Preferred Stock. After the payment of the foregoing amount, the remaining assets or property distributable upon such liquidation shall be divided pro rata among the holders of the Common Stock and the Preferred Stock. A merger, reorganization or similar transaction will be treated as a liquidation unless otherwise agreed by the holders of a majority in interest of the Preferred Stock.

**Conversion price:** If the Investor chooses the option described under Section 1(d), SAFE interests are convertible into Preferred Shares , at a price per share of the Preferred Stock determined by dividing the Valuation Cap by the total number of shares of the Company's capital stock outstanding immediately prior to such conversion.

**Participation Rights:** Preferred shareholders will be entitled to invest in the Company's next equity or hybrid debt/equity investment round (the "New Round") on the same terms and conditions as the other investors in that New Round. A "Next Round" shall be defined as the next Offering of equity or hybrid debt/equity, if that round has a minimum size of at least $1 million. The maximum amount that each Investor may invest in a New Round will be such that, after accounting for dilution from the New Round, the Investor will hold an ownership percentage in the Company equal to the percentage ownership that the Investor held at the completion of this Offering (including conversion of any Preferred shares but not including the effects of exercise of any warrants or options outstanding).

**Negative covenants:** Approval of over 50% of the shares of Preferred Stock required to (i) adversely change rights of the Preferred Stock; (ii) change the authorized number of shares; (iii) authorize a new series of Preferred Stock having rights senior to or on parity with the Preferred Stock; and (iv) increase the cash compensation level (including salary and bonus) of any Founder of the Company more than twenty-five percent (25%) from current levels.

**Founders** The Founders are defined to be Mr. Amir Benesh and Mr. Hugh Barton.

**Present LVH Capitalization:** The Company has issued a total of 5,000,000 shares, all of which are common stock. Under its revised Certification of Incorporation in the State of Delaware, dated 3/29/2017, the Company has authorization to issue up to 2,000,000 preferred shares (as well as up to 5,000,000 more common shares). If the operation of Section 1(d) of this SAFE required revision of the Certificate to authorize additional preferred shares, the Company pledges that it would take such action.

**Cashless exchange:** These transactions pursuant to Section 1(d) would be cash neutral, in the sense that they represent the conversion of SAFE interests into Preferred Shares, without the exchange of any cash.